**In re JAMES RIVER COAL COMPANY, et al., Debtors.**

No. 303–04095.

United States Bankruptcy Court, M.D. Tennessee.

Sept. 14, 2006.

## MEMORANDUM OPINION

MARIAN F. HARRISON, Judge.

This matter is before the Court upon motions to dismiss and/or motions for summary judgment filed by various defendants in the relevant adversary cases. The issue before the Court in these adversary cases is whether the Plan of Reorganization and other "plan documents" adequately preserved certain preference causes of action and certain "insider" causes of action, thus avoiding the res judicata effects of confirmation.[1]

Three groups of defendants have filed such motions: (1) general preference defendants who allegedly were paid within 90 days of bankruptcy, (2) insider defendants who are charged with, among other things, breach of fiduciary duty, deepening insolvency, fraudulent conveyances, civil conspiracy, unlawful distribution of corporate assets, and rescission, and (3) a third distinct preference defendant, Rothschild Inc., which served as financial advisor to the debtors, approved by Court order entered on May 23, 2003.[2]

After reviewing the voluminous pleadings and memoranda, which were well written by all sides, and after the argument of counsel, the Court finds that the motions by the general preference defendants and the insider defendants should be denied.

## I. *UNDISPUTED FACTS*

James River Coal Company and related entities (collectively, the "debtors") filed for bankruptcy on March 25, 2003. A Plan

Gene L. Humphreys, Paul G. Jennings, Phillip G. Young, Bass, Berry & Sims PLC, Nashville, TN, for Debtors.

1. While these adversaries involve numerous other issues, the only issue before the Court at this preliminary juncture is whether these preference actions are barred by res judicata.

2. Rothschild Inc.'s motion is considered in a separate Memorandum Opinion and Order.

of Reorganization was confirmed on April 22, 2004. This Plan and related Liquidating Trust Agreement contemplated the establishment of a trust to garner and distribute all assets. Specifically, with regard to potential causes of action, the Plan contained the following provisions:

1.1 (108) *"Unsecured Creditor Liquidating Trust Assets"* means (a) the Trust Causes of Action; (b) the Rabbi Trust Assets; and (c) the right to receive the Coal Act Refund.

1.1 (10) *"Causes of Action"* means all rights, claims, causes of action, defenses, debts, demands, damages, obligations, and liabilities of any kind or nature under contract, in tort, at law, or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto, including, without limitation, causes of action arising under Chapter 5 of the Bankruptcy Code or similar state statutes.

1.1 (104) *"Trust Causes of Action"* means all Causes of Action arising prior to the Effective Date that either (a) accrued to the Debtors as debtors in possession under Chapter 5 of the Bankruptcy Code, including, but not limited to, any and all such Causes of Action against parties who are identified on the Schedules; or (b) accrued to (i) unsecured creditors of the Debtors under applicable non-bankruptcy law prior to the Commencement Date, but are deemed under the Bankruptcy Code and applicable interpretive case law to be derivative of the Estates' interests and therefore became property of the Estates upon the commencement of the Chapter 11 Cases; or (ii) the Debtors or their Estates, in either case including, but not limited to, the Identified Actions; *provided, however,* that Trust Causes of Action shall not include (x) Causes of Action expressly released or discharged under the Plan, including, but not limited to, Causes of Action against the Senior Secured Lenders released pursuant to Section 4.2(i) of the Plan; and (y) the Retained Actions.

1.1 (93) *"Schedules"* means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such may be amended or supplemented from time to time.

1.3 *Plan Documents.* All Plan Documents are incorporated into the Plan by this reference as if set forth in full herein.

The Disclosure Statement at page 6 further provides as follows:

The assumed value of the Unsecured Creditor Liquidating Trust is $3 million, but the actual value may be higher, depending on a number of factors related to the outcome of potential lawsuits and the possibility of future legislation by the United States Congress, all of which are impossible to predict. ... Among the expenses of the trust are the fees and expenses of the Trustee, the fees and expenses of the advisory board established under the Plan to advise the Trustee (the *"Trust Advisory Board"*), and any professional advisors the Trustee retains to investigate and pursue the Trust Causes of Action. It is impossible to predict the likely recoveries, if any, from such lawsuits.

The Chart in the Disclosure Statement at page 8 gives the Trust "the right to the net proceeds, if any, of the lawsuits related to the Trust Causes of Action."

The Disclosure Statement at page 29 states in 4.2:

The Trust Causes of Action give the Trustee the right to bring certain lawsuits against third parties for, among

other things, the recoveries of preferences and fraudulent conveyances. The Debtors are unable to estimate the likely recoveries, if any, from pursuit of the Trust Causes of Action. The Trustee and the Trust Advisory Board will have sole responsibility for determining the costs and benefits from pursuing individual lawsuits, and whether and how to pursue those actions. The costs of the Trustee's fees, and the fees of Trustee Professionals, as well as the costs and fees of the Trust Advisory Board, will all have to be paid from lawsuit recoveries or any other Cash available to the trust, before any Cash distributions can be made to the General Unsecured Creditors on account of the Trust Causes of Action. For additional information concerning the Trust Causes of Action, see Section VI.[E].3.c (Treatment of Claims and Interests Under the Plan—Certain Identified Trust Causes of Action) of this Disclosure Statement.

In addition, the Plan set forth the following specific Actions Preserved:

(d) *Actions Preserved.* On the Effective Date, ... (B) any and all Trust Causes of Action shall be preserved and shall vest with the Unsecured Creditor Liquidating Trust. Specific Causes of Action included in the Trust Causes of Action consist of the following (collectively, the *"Identified Actions"*):

(i) Fraudulent Conveyance—Potential Defendants: James D. Dotson, First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P., John Tellman, Derrick Varney;

(ii) Voluntary Conveyance—Potential Defendants: James D. Dotson, First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P., John Tellman, Derrick Varney;

(iii) Breach of Fiduciary Duty and Negligence—James B. Crawford, James D. Dotson, A. Hugh Ewing, III, John A. Hill, Benjamin A. Guill, George S. Slocum, John C. Bumgarner, Jr., Edward A. Snyder, William A. MacCauley;

(iv) Unlawful Distribution of Corporate Assets—James B. Crawford, James D. Dotson, A. Hugh Ewing, III, John A. Hill, Benjamin A. Guill, George S. Slocum, John C. Bumgarner, Jr., Edward A. Snyder, William A. MacCauley;

(v) Civil Conspiracy—James B. Crawford, James D. Dotson, A. Hugh Ewing, III, John A. Hill, Benjamin A. Guill, George S. Slocum, John C. Bumgarner, Jr., Edward A. Snyder, William A. MacCauley, First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P.;

(vi) Recission—First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P.;

(vii) Deepening Insolvency—First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P.;

(viii) Aiding and Abetting Breach of Fiduciary Duty—First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P.;

(ix) Trust Fund Doctrine—James D. Dotson, Derrick Varney, John Tellman, First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P.;

(x) Fraudulent Transfer—James D. Dotson, James B. Crawford;

*provided, however,* that the foregoing list of Identified Actions and potential defendants is not exhaustive and if a specific Trust Cause of Action or defendant is not identified in this list, it is because such Trust Cause of Action and/or defendant is not known to the Committee at this time. On behalf of the Unsecured Creditor Liquidating Trust and their Estates, the Debtors reserve their rights to any other Trust Causes of Action not specifically referenced herein that may be identified on and after the Effective Date during litigation and formal discovery. A description by the Committee of the asserted factual predicates for the Identified Actions is set forth in the Disclosure Statement at Section VI.[E].3.c and is incorporated herein as if set forth in full herein.

In addition, the Disclosure Statement at pages 37–39 sets forth the following regarding the "Certain Identified Trust Causes of Action":

The Committee has provided the Debtors with the following statement concerning certain specific Causes of Action which the Committee has identified (the *"Identified Actions"*) as being part of the Trust Causes of Action:

"Prior to the Plan being filed with the Bankruptcy Court, the Committee investigated potential claims resulting from or accruing prior to the bankruptcy filings of the Debtors, including the occurrence of certain equity stock redemptions and related transfers (collectively, the *"Redemptions"*) made by James River to certain insiders (as the term is defined in Bankruptcy Code Section 101(31)). The Committee believes that the factual essence of the Redemptions is that the James River Board of Directors (the *"Board"*), under the direction and control of First Reserve, approved the Redemptions to certain insiders at a time when James River and its affiliated Debtors were insolvent, or were rendered insolvent as a result of the Redemptions being made. The Redemptions investigated by the Committee include, but are not limited to, the redemptions of stock owned by (i) James Dotson in 1999; (ii) Williams Co. (*"Williams"*) in 1998 and 1999; (iii) Derrick Varney in 2000; (iv) John Tellman in 2000; and (v) First Reserve in 2000. The Redemptions totaled approximately $57 million.

"More specifically, the Committee believes that Mr. Dotson received an approximately $12 million stock redemption (the *"Dotson Redemption"*) as a result of his position on the Board at a time when James River was insolvent, or was rendered insolvent. The Committee further believes that neither James River, nor its affiliated Debtors, had immediately available funds to make the Dotson Redemption, thus, forcing James River to borrow the funds. Further, the Committee believes that without explanation or known justification, the Board approved the amount of the Dotson Redemption, and deviated from its past practice of issuing an unsecured promissory note in completing the same. In addition, the Committee asserts that during the same relevant time periods and based upon the same or similar facts, Williams and Messrs. Varney, and Tellman received stock redemptions (collectively, the *"Other Redemptions"*) in the aggregate amount of $10.4 million.

"The Committee believes that with respect to First Reserve, at the time the Board approved its stock redemption (the *"FR Redemption"*), James River possessed and could have exercised a contractual right pursuant to a redemption and put/call agreement (the *"Agreements"*) to issue an unsecured

promissory note in exchange for First Reserve's stock. However, the Committee believes that with insider access to information related to the poor financial condition of James River, First Reserve demanded the FR Redemption be paid immediately in cash and refused to accept a promissory note. In addition, upon its investigation of the FR Redemption, the Committee believes that First Reserve, via two of its Board members and its supermajority control of James River, threatened to derail a pending credit facility in favor of James River and its affiliated Debtors unless James River modified the Agreements and made the FR Redemption payment in cash. The Committee asserts that the FR Redemption was approximately $35 million.

"The Committee further asserts that in order to complete the FR Redemption, the Dotson Redemption, and the Other Redemptions, additional secured indebtedness was authorized by the Board to be incurred by the Debtors, thereby deepening their insolvency. The Committee believes that the FR Redemption, the Dotson Redemption, and the Other Redemptions, among other possible unknown transfers, left the Debtors with significant additional secured bank debt obligations, ultimately making them unable to pay their secured and unsecured creditors.

"In addition, the Committee believes that immediately prior to the Commencement Date, the same Board forgave millions of dollars of loans (the "*Insider Loans*") owed to the Debtors by James Crawford and Mr. Dotson. The Committee asserts that thereafter, the underlying collateral for the Insider Loans, without any known consideration being paid in exchange, was turned over by the Board to Crawford."

The Committee has asserted that as of the date of this Disclosure Statement, the Identified Actions consist of the following; *provided, however,* that the Committee has asserted that the following list of Causes of Action and potential defendants is not exhaustive and that if a specific Cause of Action or defendant is not identified in the following list, it is because such Cause of Action or defendant is not known at this time and, at the request of the Committee and on behalf of the Unsecured Creditor Liquidating Trust and the Estates, the Debtors reserve their rights to any other Trust Causes of Action not specifically referenced in the following list that may be identified following the Effective Date during the litigation and formal discovery process contemplated with respect to the Trust Causes of Action:

(i) Fraudulent Conveyance—Potential Defendants: James D. Dotson, First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P., John Tellman, Derrick Varney.

(ii) Voluntary Conveyance—Potential Defendants: James D. Dotson, First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P., John Tellman, Derrick Varney.

(iii) Breach of Fiduciary Duty and Negligence—James B. Crawford, James D. Dotson, A. Hugh Ewing, III, John A. Hill, Benjamin A. Guill, George S. Slocum, John C. Bumgarner, Jr., Edward A. Snyder, William A. MacCauley.

(iv) Unlawful Distribution of Corporate Assets—James B. Crawford, James D. Dotson, A. Hugh Ewing, III, John A. Hill, Benjamin A. Guill,

George S. Slocum, John C. Bumgarner, Jr., Edward A. Snyder, William A. MacCauley.

(v) Civil Conspiracy—James B. Crawford, James D. Dotson, A. Hugh Ewing, III, John A. Hill, Benjamin A. Guill, George S. Slocum, John C. Bumgarner, Jr., Edward A. Snyder, William A. MacCauley, First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V–2, L.P., First Reserve Fund VI, L.P.

(vi) Rescission—First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V–2, L.P., First Reserve Fund VI, L.P.

(vii) Deepening Insolvency—First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V–2, L.P., First Reserve Fund VI, L.P.

(viii) Aiding and Abetting Breach of Fiduciary Duty—First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V–2, L.P., First Reserve Fund VI, L.P.

(ix) Trust Fund Doctrine—James D. Dotson, Derrick Varney, John Tellman, First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V–2, L.P., First Reserve Fund VI, L.P.

(x) Fraudulent Transfer—James D. Dotson, James B. Crawford.

On April 9, 2004, the Official Committee of Unsecured Creditors filed notice of its appointment of Anthony H.N. Schnelling and Bridge Associates LLC (hereinafter "Trustee") as liquidating trustee. In March 2005, the Trustee filed 310 adversary complaints, including the ones discussed herein, on behalf of the Liquidating Trust.

## II. STANDARD OF REVIEW

The defendants filed their motions pursuant to Fed. R. Bankr.P. 7012, or alternatively, under Fed. R. Bankr.P. 7056. Because the Court has reviewed evidence from outside the pleadings in these adversary proceedings, it will review the motions under the summary judgment standard. *See, e.g., Benzon v. Morgan Stanley Distrib., Inc.*, 420 F.3d 598, 603 (6th Cir. 2005) ("Ordinarily, when a district court considers evidence outside the pleadings, a 12(b)(6) motion will 'be treated as one for summary judgment and disposed of as provided in Rule 56.' ") (quoting Fed. R.Civ.P. 12(b)(6)).

Federal Rule of Civil Procedure 56(c), as incorporated by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and/or discovery materials which demonstrate that there is no genuine disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party meets that initial burden, the burden is shifted to the nonmoving party to go beyond the pleadings and by affidavits, depositions, answers to interrogatories, and/or admissions, designate specific facts showing that a genuine issue of fact does remain for trial. *Id.; see also Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir.1990) (nonmoving party "must show sufficient evidence to create a genuine issue of material fact" to prevail).

### III. *DISCUSSION*

■ The confirmation of a Chapter 11 plan constitutes a final judgment in bankruptcy proceedings. *Browning v. Levy,* 283 F.3d 761, 772 (6th Cir.2002) (citing *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.,* 973 F.2d 474, 480 (6th Cir. 1992)). Thus, confirmation of a Chapter 11 plan can be preclusive of preference and other causes of action on principles of res judicata. However, under 11 U.S.C. § 1123(b)(3), preclusion can be prevented by providing in the plan for the preservation of those actions:

Subject to subsection (a) of this section, a plan may—

* * * *

(3) provide for—

(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

(B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest.

Although 11 U.S.C. § 1123(b)(3) does not set forth the language necessary or sufficient to preserve a particular claim or cause of action, Judge Lundin has set forth an extensive discussion and analysis of this issue in *Elk Horn Coal Co., LLC v. Conveyor Mfg. & Supply, Inc. (In re Pen Holdings, Inc.),* 316 B.R. 495, 504 (Bankr. M.D.Tenn.2004):

Read in the context of its history, § 1123(b)(3) protects the estate from loss of potential assets. It is not designed to protect defendants from unexpected lawsuits. The words sufficient to satisfy § 1123(b)(3) must be measured in the context of each case and the particular claims at issue: Did the reservation allow creditors to identify and evaluate the assets potentially available for distribution?

### A. *PREFERENCE ACTIONS*

■ In *Pen Holdings,* the plan defined avoidance actions to include "all preference claims under Section 547," and it included avoidance actions as retained causes of action to be pursued. The Disclosure Statement included avoidance actions in its description of "Other Assets." The statement of financial affairs included a list of payments made within the preference period. Based on these facts, Judge Lundin held that the plan preserved preference actions:

This outcome is influenced by the fact that preference litigation is fundamentally different than the legal malpractice and breach of duty claims in *Browning.* The universe of causes of action that become assets of Chapter 11 estates and that might be the objects of preservation at confirmation under § 1123(b)(3) is immense. But almost every debtor that comes into Chapter 11 has made payments to creditors during the 90 days or one year (insiders) before bankruptcy. Potential preference actions are often numerous (for example, $6 billion in *Kmart*) and require extensive accounting and prefiling preparation by the debtor or trustee. Preference litigation is not often initiated, and more rarely completed, before confirmation of a plan in Chapter 11 cases.

It is not practicable, especially in larger cases, for the debtor to identify by name in the plan or disclosure statement every entity that may have received a preferential payment.

*Id.* at 504.

As in *Pen Holdings,* the preference actions were preserved in the present case. The Plan specifically preserved "actions under chapter 5 of the Bankruptcy Code." That preference and fraudulent convey-

ance claims would be assets of the Liquidating Trust, to be investigated and prosecuted by the Trustee, was disclosed in the Disclosure Statement. In addition, creditors were informed in the Disclosure Statement that it was not possible at that time to predict the outcome or value of those causes of action, and it should not have been a surprise that many preference actions would be filed just as in other large cases. Finally, the debtors' Statements of Affairs identified payments made by the debtors within 90 days before the bankruptcy. Accordingly, as to the Trustee's claims seeking to avoid transfers within the 90 days prior to bankruptcy, the Court finds that sufficient notice was given in the debtors' Plan and Disclosure Statement to preserve the Trustee's causes of action, and thus, these actions are not barred by res judicata.

### B. INSIDER ACTIONS

▮ The same is true with regard to the claims against the insider defendants. These defendants assert that by providing detailed information about some of the insider defendants and some of the claims, that the Trustee is now precluded from asserting unspecified claims and from bringing claims against unnamed defendants.

Ironically, just as the preference defendants ask this Court to penalize the Trustee because of the lack of information given, the insider defendants ask the Court to penalize the Trustee because the information about these types of defendants given was too detailed. However, the Court finds that these claims were preserved by the language contained in the Disclosure Statement and Plan. In addition to the known claims (that were set forth in great detail), the Plan further stated that "the foregoing list of Identified Actions and potential defendants is not exhaustive and if a specific Trust Cause of Action or defendant is not identified in this list, it is because such Trust Cause of Action and/or defendant is not known to the Committee at this time." Similar language was contained in the Disclosure Statement. The Court finds that this was sufficient notice under *Pen Holdings* and that the motions filed by the insider defendants should be denied as well.

### IV. CONCLUSION

Accordingly, the Court finds that the debtors' Plan of Reorganization and other "plan documents" adequately preserved the preference and "insider" causes of actions, thus avoiding the res judicata effects of confirmation.

The Trustee shall submit an order in each of the relevant adversary proceedings that incorporates the Court's findings and denies the motions for summary judgment. Discovery deadlines will be discussed at the next Omnibus Hearing, scheduled for October 12, 2006.